IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-420

Filed 2 April 2024

Office of Administrative Hearings, No. 17 OSP 08518

JUDITH M. AYERS, Petitioner,

v.

CURRITUCK COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent.

Appeal by Respondent from final decision entered 31 January 2023 by Administrative Law Judge Melissa Owens Lassiter in the Office of Administrative Hearings. Heard in the Court of Appeals 1 November 2023.

> *Hornthal, Riley, Ellis, & Maland, L.L.P., by John D. Leidy, for petitioner-appellee.*
>
> *Teague, Campbell, Dennis & Gorham, L.L.P., by Luke A. West and Jennifer B. Milak, and The Twiford Law Firm, P.C., by Courtney Hull, for respondent-appellant.*

MURPHY, Judge.

For the third time, Respondent-Appellant Currituck County Department of Social Services ("DSS") appeals from an Office of Administrative Hearings ("OAH") final decision reversing the dismissal of Petitioner-Appellee Judith Ayers from her position as Social Worker Supervisor III for unacceptable personal conduct ("UPC"). Having twice remanded, we now affirm.

A State agency may only discipline a career state employee for just cause. N.C.G.S. § 126-34.02 (2023). "Just cause is a flexible concept, embodying notions of

equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case." *Wetherington v. N.C. Dep't of Pub. Safety* ("*Wetherington I*"), 368 N.C. 583, 591 (2015) (marks omitted). This requires the agency to consider various factors and balance the equities to arrive at the appropriate level of discipline. *See Wetherington v. NC Dep't of Pub. Safety* ("*Wetherington II*"), 270 N.C. App. 161, 194, *disc. rev. denied*, 374 N.C. 746 (2020). It does not permit the agency to manipulate its inquiry to contrive just cause for a preordained level of discipline. *See id.* at 185-201 (reversing the ALJ's determination of just cause where the agency shoehorned a per se rule into the case's eponymous multifactor just cause analysis).

An agency's determination of just cause is subject to both administrative and judicial review. *See Harris v. N.C. Dep't of Pub. Safety*, 252 N.C. App. 94, 98, *aff'd per curiam*, 370 N.C. 386 (2017). At both levels, the tribunal reviews whether the facts support the existence of just cause de novo. *Id.* at 100, 102. However, "the [administrative law judge ('ALJ')] is the sole fact-finder, and the only tribunal with the ability to hear testimony, observe witnesses, and weigh credibility." *Id.* at 108.

Where the ALJ concluded the agency lacked just cause based on its findings of fact and where those findings were supported by substantial evidence, the agency must show the ALJ's determination was an error of law. In such cases, if the agency merely argues how its own version of the facts might have supported a contrary conclusion without demonstrating that the ALJ committed errors of law, the agency

does not carry its burden of proving it acted with just cause because "we defer to the ALJ's findings of fact [when supported by substantial evidence], even if evidence was presented to support contrary findings." *Id.*

Here, we hold the ALJ's findings of fact, to the extent necessary for the ultimate just cause determination, were supported by substantial evidence in the record. We further hold, upon de novo review, that there was no error in the ALJ's determination that DSS lacked just cause to dismiss Ayers for her single instance of UPC in light of the facts and circumstances of this case. Accordingly, we affirm the ALJ's final decision to retroactively reinstate Ayers with back pay and attorneys' fees, subject to a two-week suspension without pay and subject to her taking additional cultural diversity and racial sensitivity training.

## **BACKGROUND**

The facts of Ayers's UPC and DSS's initial response are fully set out in the initial appeal. *Ayers v. Currituck Cnty. Dep't of Soc. Servs.* ("*Ayers I*"), 267 N.C. App. 513, 514-19 (2019). The facts of the ALJ's Final Decision on Remand from *Ayers I* are fully set out in the second appeal. *Ayers v. Currituck Cnty. Dep't of Soc. Servs.* ("*Ayers II*"), 279 N.C. App. 514, 515-19 (2021). Partially borrowing from *Ayers II*, "we include a recitation of the facts and procedural history relevant to the issues currently before us":

### **A. Prior to Incident**

. . . Ayers had been employed with DSS from 2007 until the incident in 2017. Ayers was the supervisor for the Child Protective Services Unit at DSS who reported directly to the DSS Director. Neither party contests that Ayers was a career State employee.

Ayers consistently received positive work performance reviews and had never been disciplined as a DSS employee before the incident occurred. Until 30 June 2017, her boss was the DSS Director, Kathy Romm, who had hired Ayers; Romm had asked Ayers whether she wanted to take her position upon Romm's retirement. Ayers declined to pursue the position, and Romm hired another DSS employee, Samantha Hurd. Both Ayers and Hurd are Caucasian women.

Prior to Hurd's promotion, she supervised DSS's Foster Care Unit, and she and Ayers had a history of disagreements and conflict in their roles. The disagreements and conflict continued after Hurd's promotion.

## B. Incident

On 3 November 2017, Hurd asked Ayers about a racial demarcation–"NR"–that a social worker had included on a client intake form; Hurd did not recognize the demarcation, asked Ayers what it stood for multiple times, and Ayers responded with a racial epithet. Ayers claimed she said "nigra rican," while Hurd claimed Ayers said "[n-----] rican" ("the N word"). According to testimony from Hurd and Ayers, Ayers initially laughed about the comment, but became apologetic and embarrassed soon afterward. After investigation, Hurd and Ayers discovered the client referred to on the form was Caucasian.

## C. Disciplinary Action

The incident occurred on Friday, 3 November 2017, and Hurd conferred with DSS's counsel over the following weekend. After receiving guidance, Hurd applied a twelve-

factor test, derived from a guide for North Carolina public employers published by the University of North Carolina at Chapel Hill Institute of Government, to Ayers's comment and instituted disciplinary proceedings against her on Monday, 6 November 2017. . . .

. . . .

After meeting with Ayers, Hurd placed her on investigatory status with pay, and subsequently terminated her employment with DSS; Ayers appealed, and Hurd affirmed her decision. Ayers filed a Petition for a Contested Case Hearing with the Office of Administrative Hearings.

## D. 13 June 2018 ALJ Decision

An ALJ held a contested case hearing on 19 April 2018 and reversed Hurd's termination decision in a *Final Decision* filed 13 June 2018 ("First ALJ Order"). Findings of Fact 23 and 47 in the First ALJ Order described Ayers's and Hurd's different recollections of the word Ayers used, but the First ALJ Order also included the word "negra-rican," which was a third variation of the word. A fourth variation, "negro-rican," appeared in Conclusion of Law 13. The ALJ applied the three-prong test from *Warren*, determined the first prong of "whether the employee engaged in the conduct the employer alleges[,]" was not met in light of the disagreements on verbiage, and reversed Hurd's termination of Ayers. DSS appealed the First ALJ Order.

## E. *Ayers I*

In an opinion filed 1 October 2019, we vacated and remanded the First ALJ Order. We noted Finding of Fact 23 from the First ALJ Order, which included a third and incorrect variation of the word used when describing the disagreement on epithet verbiage between Ayers and Hurd, was the "critical finding driving the ALJ's analysis" in its reversal of Hurd's termination decision. We found,

the ALJ's [f]inding is not supported by the evidence in the [r]ecord[, particularly Ayers's own testimony]. It is then apparent the ALJ carried out the remainder of its analysis under the misapprehension of the exact phrase used and that the ALJ's understanding of the exact phrase used was central to both the rest of the ALJ's [f]indings and its [c]onclusions of [l]aw. Therefore, we vacate the [First ALJ Order] in its entirety and remand this matter for the ALJ to reconsider its factual findings in light of the evidence of record and to make new conclusions based upon those factual findings.

In addition to noting "the ALJ's conclusions and considerations of the 'totality of the circumstances' were also grounded in its misapprehension of the evidentiary record[,]" we held either "'n----- rican' or the variant 'nigra rican'" "constitute[d] a racial epithet[,]" and DSS "met its initial burden of proving [Ayers] engaged in the conduct alleged under *Warren*." In vacating the First ALJ Order, we instructed the ALJ to "make new findings of fact supported by the evidence in the record and continue its analysis under *Warren* of whether [Ayers] engaged in unacceptable conduct constituting just cause for her dismissal or for the imposition of other discipline."

**F. ALJ Decision on Remand**

On remand, the ALJ entered its *Final Decision on Remand* ("Second ALJ Order") on 5 May 2020, made additional findings of fact and conclusions of law, applied the three-prong *Warren* test, and reversed DSS's termination of Ayers. The ALJ decided the first two prongs of the *Warren* test–Ayers engaging in the conduct alleged and the conduct constituting unacceptable personal conduct–were met. . . . [Specifically, the ALJ concluded Ayers's conduct was that for which no reasonable person should expect to receive prior warning, a willful violation of DSS's written personnel policy, and conduct unbecoming of an employee.]

- 6 -

However, the ALJ concluded the third prong of the *Warren* test–whether DSS had just cause for the disciplinary action taken under N.C.G.S. § 126-35(a)–was not met. In concluding a lesser disciplinary measure was warranted, the Second ALJ Order focused on: Ayers's "ten-year employment history with no prior disciplinary actions" and high performance reviews; that Hurd "did not think it was significant whether anyone heard [Ayers's] comment"; the lack of evidence that this one-time comment was harassment of a specific individual or caused actual harm to DSS, until DSS revealed the incident to others; and that DSS's decision "was influenced by . . . past philosophical differences [between Hurd and Ayers] and their past history." However, the Second ALJ Order also found that "[DSS] did not consider if [Ayers's] . . . comment caused any actual harm to the agency's reputation. [DSS] only considered potential harm to the agency." The Second ALJ Order also acknowledged the lack of resolution regarding whether anyone other than Hurd heard Ayers's epithet, which the ALJ deemed a "necessary consideration." Despite the lack of resolution of the resulting harm factor from *Wetherington I*, the Second ALJ Order retroactively reinstated Ayers with a two-week suspension without pay, ordered back pay, and ordered reimbursement of Ayers's attorney fees.

*Id.* (alterations in original) (citations omitted); (citing *Warren v. N.C. Dep't of Crime Control & Pub. Safety* ("*Warren I*"), 221 N.C. App. 376, *disc. rev. denied*, 366 N.C. 408 (2012)).

## G. *Ayers II*

DSS appealed the Second ALJ Order, arguing "(A) 'the ALJ made findings of fact not supported by substantial evidence' in its Second ALJ Order; (B) specific conclusions of law from the Second ALJ Order are erroneous; and (C) DSS 'had just cause to dismiss [Ayers].'" *Id.* at 520 (alterations in original). In an opinion filed 5

October 2021, we determined we could not meaningfully conduct our appellate review because, "[f]or us to conduct meaningful appellate review regarding just cause for disciplinary action, the ALJ must [have made] complete findings of fact regarding the harm to DSS resulting from Ayers's UPC, including whether any occurred"; but

> the ALJ found that Hurd, as DSS's representative in the disciplinary decision regarding Ayers, did not consider the necessary resulting harm factor, and thus did not consider all of the required factors.
>
> . . . .
>
> Substantial evidence support[ed] the ALJ's determination that Hurd, and DSS, did not consider a required factor under *Wetherington I.*

*Id.* at 520, 524-26. Accordingly, we "remand[ed] to the ALJ with instructions to remand to DSS to conduct a complete, discretionary review regarding Ayers's UPC and corresponding disciplinary action." *Id.* at 526.

**H. DSS's Investigation on Remand and Final Agency Decision Addendum**

Per our instructions, the ALJ further remanded to DSS "to conduct a complete disciplinary review[.]" In the course of this investigation, Hurd reviewed the prior documentation of the case: the First and Second ALJ Orders; our *Ayers I* and *Ayers II* opinions; conference and hearing transcripts; termination, reply, and appeal letters between Ayers and Hurd; various DSS policies and job descriptions; the North Carolina State Administrative Code; and the case file whose incomplete reporting was the genesis this now-half-decade-long series of appeals and remands. Hurd

additionally reviewed DSS's daily reception logs of visitors and determined a client

was in the building at the time of Ayers's UPC but did not further investigate whether

the client was aware of the incident. Hurd also, for the first time, interviewed Tiffany

Sutton, a black employee under Ayers's supervision whom Hurd previously identified

as speculatively having overheard Ayers's UPC. Sutton had not overheard Ayers's

UPC but learned of it at some indeterminable time from gossip surrounding Ayers's

absence. Hurd did not interview any other employee as part of this investigation.

Upon concluding her investigation, Hurd issued DSS's Final Agency Decision

Addendum ("Addendum") setting forth Hurd's and DSS's bases for resulting and

potential harm, including:

> **Harm to the agency's provision of services**
>
> The ability to perform the essential functions of the Social
> Work Supervisor III position has been irreparably harmed
> as a result of your conduct. Your unacceptable conduct
> caused a complete abrogation of your ability to fulfil
> operational and personnel responsibilities. These duties
> require supervisors to function autonomously with little to
> no supervision. Engaging in this conduct altered your
> ability to perform independently in the work environment.
> Further, your ability to testify objectively before any
> tribunal has been called into question. That is a risk I
> cannot accept. Your ability to supervise any program or
> exercise sound judgement [sic] in any dynamic has been
> completely compromised.
>
> You are unable to complete any job task in the agency
> without total supervision. This is a burden the agency
> cannot bear. Your conduct interrupted the normal duties
> of the Director and other supervisory personnel causing
> them to assume your workload, a disruption to the

workflow of the agency with no other back-up position available. A bias was demonstrated by stereotyping a family[.] . . . Bias negatively affects every aspect on the continuum of social services programming, including child welfare reporting. During the time between the pre-disciplinary conference and the local appeals hearing you submitted contradictory information regarding your conduct. . . . This insubordination[1] caused harm to the agency, as such undermines the ability to trust your judgement [sic], or allow you to complete essential job duties autonomously as is required. Thus, I have no confidence in your ability to be forthcoming and honest in all aspects of your work. You cannot be permitted to perform work in any capacity within the agency with certitude you will not alter, suppress, or omit material facts. Moreover, your conduct has damaged my confidence in your ability to serve with integrity as Director's Designee and there was no back up to fulfil that role in your absence.

**Harm to morale**

Your conduct offended a Currituck County employee, the Social Services Director. I consider your conduct to be highly offensive, vulgar, crude, and discriminatory. It further harmed the morale of the agency by creating an uncomfortable and untrusting team atmosphere among subordinates, colleagues, and your immediate supervisor. The authority given to you as a supervisor was undermined

---

[1] The ALJ found,

> Hurd never charged Petitioner with being insubordinate in any disciplinary letter or advised Petitioner that she was being terminated from employment for being insubordinate. The first time [] Hurd determined that Petitioner was engaged in insubordination in November 2017, was in Hurd's [21 March 2022] Final Agency Decision Addendum. . . . [T]he evidence presented in these proceedings failed to show that Petitioner was insubordinate during the DSS local appeals hearing.

DSS challenges this finding but does not argue we should consider Ayers's alleged insubordination in our analysis of just cause.

by your actions and the conduct destroyed the trust of your employer to rely upon you to make fair, objective decisions without concern for prejudice.

**Harm to agency mission and work of the agency**

The conduct violated the following policies: 1.) [DSS's] Civil Rights Action [*sic*] of 1964 Requirements policy, 2.) The Currituck County Personnel Policy, . . . and 3.) The . . . [DSS] Family Services manual . . . .

Violating policy constitutes harm to the agency because it frustrates the purpose of having a policy to follow at all. Between the investigatory leave period and the local appeals hearing, you failed to demonstrate introspection regarding your conduct. This negates any prospect of rehabilitation without unacceptable risk. The agency suffered yet more harm by having to post the position, recruit, and train a replacement. In the interim, the Director and another supervisor assumed your job duties which interfered with the daily business operations of the agency.

**Harm to agency budget**

. . . . As a result of the lack of cooperation and subsequent dismissal, the department was required to retain an attorney, incur legal expenses, hire and train a replacement for the position, and interrupt other personnel from their duties to be involved in the litigation process.

**Detrimental to state service- social harm**

[The Addendum cursorily characterizes Ayers's UPC as hate speech and offensive conduct detrimental to state services. DSS does not argue we should consider this 'social harm' in our just cause analysis.]

**Potential harm**

. . . . [T]he Director is accountable to the social services board, and is responsible and accountable for the actions, conduct and performance of departmental employees. . . . The [DSS] Board agrees with my decision to terminate your employment. Retaining your employment in any capacity within the department after using a racial epithet during the course of your governmental duties, would cause the board to doubt my ability to effectively administer our programming, personnel and distrust my decision making and judgement. This would adversely affect the relationship between the Director and the board and would damage the integrity they expect regarding the performance of my duties. . . .

As referenced, your conduct severely violated crucial polices [sic] and rules. An employee who cannot be trusted to follow rules when in the presence of the Social Services Director, cannot be trusted to follow rules when working independently. Your continued employment in any capacity would make the agency vulnerable to negligent retention and supervision which would subject the county to liability.[2] Additionally, your good faith and credibility could be of great concern, thereby damaging your testimony in the multiple cases in which you are required to testify. Continuing to entrust you with the oversight of child welfare cases, or any other matters within the agency knowing that you have demonstrated overt racism, bias and stereotyping in the course of your work, subjects the county to additional liability.

Your conduct violated the agency's compliance with the Civil Rights Act of 1964. The violation could potentially affect the agency's receipt of federal funding. Your actions would affect public trust, client confidence, and destroy the agency's credibility in the community if I simply ignored your remarks and returned you to any employment.

---

[2] We do not opine on Hurd's legal conclusions, except to the extent discussed in our analysis as necessary for our ultimate just cause conclusion.

> After conducting a thorough investigation and careful review of the totality of facts and circumstances, I affirm my decision to terminate your employment . . . for unacceptable personal conduct. I conclude you are unable to complete any of the above duties fairly or independently without total and continuous supervision. The need and frequency of total supervision required to continue your employment in a supervisory position or any other position within the department is an accommodation the department is unable to implement. There are no positions available within the department of social services that do not include interacting with and providing services to the public in a fair, non-biased manner. . . .

## I. 31 January 2023 ALJ Decision

On 31 January 2023, the ALJ entered its *Amended Final Decision on Remand*, containing additional findings of fact and conclusions of law. The ALJ found the Addendum "unreasonable and [] most likely the result of [Hurd's] bias in favor of supporting and justifying her original action in dismissing Petitioner." She further found the Addendum's bases for actual harm "[were] all either descriptions of potential harm or resulted from [] Hurd's decision to dismiss Petitioner and were not caused by or the result of the incident itself" and that "Hurd's subjective opinion" "that Petitioner was not fit to be entrusted with her supervisory or other duties" was "unsubstantiated, speculative, [] unreasonable[,] not supported by a preponderance of the evidence[,] and [] contrary to other evidence in the record."

Determining "Petitioner's unacceptable conduct did not cause Respondent to experience any actual harm[,]" the ALJ concluded DSS lacked just cause to dismiss

Ayers and retroactively reinstated Ayers with back pay and attorney fees, subject to a two-week suspension without pay and additional cultural diversity and racial sensitivity training.

DSS appeals, again arguing it had just cause to dismiss Ayers and challenging specific findings of fact and conclusions of law. On this appeal, DSS additionally requests we reverse the ALJ's award of attorneys' fees based on its view of the merits.

## ANALYSIS

### A. Standard of Review

"It is well settled that in cases appealed from administrative tribunals, questions of law receive *de novo* review, whereas fact-intensive issues such as sufficiency of the evidence to support an agency's decision are reviewed under the whole-record test." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 659 (2004); *see* N.C.G.S. § 150B-51(c) (2023). "Under the *de novo* standard of review, the [reviewing] court considers the matter anew and freely substitutes its own judgment for the agency's." *Wetherington II*, 270 N.C. App. at 172. In contrast, under the whole record test,

> [the reviewing court] may not substitute its judgment for the [ALJ's] as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*. Rather, a court must examine all the record evidence—that which detracts from the [ALJ's] findings and conclusions as well as that which tends to support them—to determine whether there is substantial evidence to justify the [ALJ's] decision.

- 14 -

> Substantial evidence is relevant evidence a reasonable mind might accept as adequate to support a conclusion.
>
> We undertake this review with a high degree of deference because it is well established that
>
> [i]n an administrative proceeding, it is the prerogative and duty of [the ALJ], once all the evidence has been presented and considered, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. The credibility of witnesses and the probative value of particular testimony are for the [ALJ] to determine, and [the ALJ] may accept or reject in whole or part the testimony of any witness.

*Harris*, 252 N.C. App. at 100 (fifth, sixth, seventh, and eighth alterations in original) (marks and citation omitted); *see Carroll*, 358 N.C. at 674 ("[T]he 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence.").

Thus, "we recognize the ALJ is the sole fact-finder, and the only tribunal with the ability to hear testimony, observe witnesses, and weigh credibility. As such, we defer to the ALJ's findings of fact, even if evidence was presented to support contrary findings." *Harris*, 252 N.C. App. at 108. We review the ALJ's findings of fact and conclusions of law based on their substance rather than their label. *See Watlington v. Dep't of Soc. Servs. of Rockingham Cnty*, 261 N.C. App. 760, 768 (2018) (quoting *In re Simpson*, 211 N.C. App. 483, 487-88 (2011)) ("When this Court determines that findings of fact and conclusions of law have been mislabeled by the trial court, we

may reclassify them, where necessary, before applying our standard of review."). "Generally, any determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law. Any determination made by logical reasoning from the evidentiary facts, however, is more properly classified a finding of fact." *Simpson*, 211 N.C. App. at 487. (marks and citation omitted).

The ALJ "need not recite all of the evidentiary facts but must find those material and ultimate facts from which it can be determined whether the findings are supported by the evidence and whether they support the conclusions of law reached." *See Rittelmeyer v. Univ. of N.C. at Chapel Hill*, 252 N.C. App. 340, 350-51, *disc. rev. denied*, 370 N.C. 67 (2017); *see, e.g.*, *Ayers II*, 279 N.C. App. at 523-27 (remanding based on the lack of findings and evidence of the necessary resulting harm factor). An ultimate finding is a finding supported by other evidentiary facts reached by natural reasoning. *In re G.C.*, 384 N.C. 62 67 (2023). "A . . . finding of an ultimate fact is conclusive on appeal if the evidentiary facts reasonably support the [tribunal's] ultimate finding." *State v. Fuller*, 376 N.C. 862, 864 (2021). Likewise, evidentiary facts are conclusive on appeal if supported by substantial evidence in the record or unchallenged by the parties. *In re Berman*, 245 N.C. 612, 616-17 (1957) ("The administrative findings of fact . . . if supported by competent, material and substantial evidence in view of the entire record, are conclusive upon a reviewing court, and not within the scope of its reviewing powers."); *Brewington*, 254 N.C. App.

1, 17 (2017), *disc. rev. denied*, 371 N.C. 343 (2018) (quoting *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)) ("Where no exception is taken to a finding of fact . . ., the finding is presumed to be supported by competent evidence and is binding on appeal.").

We need not review every challenged finding of fact, only those necessary "to determine whether the ALJ properly ruled that [DSS] [failed to] establish[] by a preponderance of the evidence that [it] had just cause to terminate [Ayers's] employment[.]" *See Blackburn v. N.C. Dep't of Pub. Safety*, 246 N.C. App. 196, 210, *disc. rev. denied*, 368 N.C. 919 (2016).

**B. ALJ and Appellate Court Just Cause Review**

State employees in North Carolina enjoy legislatively-enacted career protections. Among these is that no career State employee "shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause." N.C.G.S. § 126-35 (2023). "This Section establishes a condition precedent that must be fulfilled by the employer *before* disciplinary actions are taken." *Brown v. Fayetteville State Univ.*, 269 N.C. App. 122, 130 (2020) (emphasis added) (marks omitted). This is true for every career State employee, and one's "position as a supervis[or] . . . does not lower the standard that must be met in order to justify his dismissal." *Whitehurst v. E. Carolina Univ.*, 257 N.C. App. 938, 948 (2018).

An employee who believes she was disciplined without just cause may pursue a grievance. Under the grievance procedure, she is entitled to an informal final agency decision that specifically sets forth the basis for her dismissal. N.C.G.S. §

126-34.01 (2023). She may appeal that decision to the OAH "as a contested case pursuant to the method provided in [N.C.G.S.] § 126-34.02" and N.C.G.S. § 150B-22 et seq. *Harris*, 252 N.C. App. at 98. On appeal to the OAH, the agency must show just cause by a preponderance of the evidence, N.C.G.S. § 150B-25.1(c) (2023),[3] and the "ALJ is free to substitute their judgment for that of the agency regarding the legal conclusion of whether just cause existed for the agency's action." *Harris*, 252 N.C. App. at 102. The ALJ enters a final decision, specifying findings of fact and conclusions of law, N.C.G.S. § 150B-34(a) (2023), and may reinstate the employee and award back pay and attorneys' fees as appropriate "without regard to the initial agency's determination." *Harris*, 252 N.C. App. at 102; *see* N.C.G.S. § 126-34.02(a), (e) (2023). A party may appeal the ALJ's final decision directly to this Court, N.C.G.S. §§ 7A-29(a), 126-34.02(a) (2023),[4] and we review the existence of just cause de novo. *Wetherington II*, 270 N.C. App. at 190.

Just cause may be based on either unsatisfactory job performance or UPC. 25 N.C.A.C. 1J.0604(b) (2023). DSS alleges Ayers's conduct met three grounds of UPC, as enumerated in the North Carolina Administrative Code:

---

[3] Specifically, the statute reads, "[t]he burden of showing by a preponderance of the evidence that a career State employee subject to Chapter 126 of the General Statutes was discharged, suspended, or demoted for just cause rests with the agency employer." N.C.G.S. § 150B-25.1(c) (2023). Despite the clarity of this language, DSS, at times, misapprehends the burden of proof, stating, "Respondent contends Petitioner failed to meet her burden of proving Respondent acted without 'just cause' in terminating her employment."

[4] Previously appeal was to the Superior Court, as governed by N.C.G.S. § 150B-43. *See* N.C.G.S. § 126-37(b2) (2012). Hence, some cases refer to the reviewing court as the "trial court." *E.g.*, *Carroll*, 358 N.C. at 660 ("[T]he trial court applies the whole record test . . . .").

(a) conduct for which no reasonable person should expect to receive prior warning;

. . .

(d) the willful violation of known or written work rules;

(e) conduct unbecoming a [S]tate employee that is detrimental to [S]tate service . . . .

*See* 25 N.C.A.C. 1J.0614(8)(a), (d)-(e) (2023).

Whether an agency has just cause to discipline an employee based on UPC requires three inquiries:

> [t]he proper analytical approach is to first determine whether the employee engaged in the conduct the employer alleges. The second inquiry is whether the employee's conduct falls within one of the categories of [UPC] provided by the Administrative Code. [UPC] does not necessarily establish just cause for all types of discipline. If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the third inquiry: whether that misconduct amounted to just cause for the disciplinary action taken. Just cause must be determined based upon an examination of the facts and circumstances of each individual case.

*Warren I*, 221 N.C. App. at 383. The ALJ concluded—and Ayers does not contest in this appeal—that Ayers's use of a racial epithet was UPC under all three of DSS's alleged examples under the North Carolina Administrative Code. *Ayers II*, 279 N.C. App. at 519. Accordingly, we consider the third inquiry: whether DSS has proven by the preponderance of the evidence that Ayers's UPC amounts to just cause to dismiss her. We conclude DSS did not meet its burden.

**C. The Just Cause Framework**

"Whether conduct constitutes just cause for the disciplinary action taken is a question of law we review *de novo*." *Warren I*, 221 N.C. App. at 378. "Just cause, like justice itself, is not susceptible of precise definition. It is a flexible concept, embodying notions of equity and fairness[.]" *Carroll*, 358 N.C. at 669 (marks and citations omitted). "Inevitably, [the just cause] inquiry requires an irreducible act of judgment that cannot always be satisfied by the mechanical application of rules and regulations*." Id.* Rather, "public agency decision-makers must use discretion in determining what disciplinary action to impose in situations involving alleged unacceptable personal conduct[.]" *Brewington*, 254 N.C. App. at 25 (characterizing this as the "primary holding" of *Wetherington I*, 368 N.C. at 593); *see also Warren I*, 221 N.C. App. at 382 ("[N]ot every instance of unacceptable personal conduct as defined by the Administrative Code provides just cause for discipline.").

Accordingly, "[a] formulaic approach" "comparing the misconduct in this case to the misconduct in . . . cases in which our appellate courts have held just cause for dismissal existed . . . is unpersuasive, as just cause '. . . can only be determined upon an examination of the facts and circumstances of each individual case.'" *Watlington*, 261 N.C. App. at 770 (quoting *Carroll*, 358 N.C. at 669). However, we look to precedent to guide our application of the facts and circumstances of each individual case: consideration of "factors such as the severity of the violation, the subject matter involved, the resulting harm, the [employee's] work history, [and] discipline imposed

in other cases involving similar violations . . . is an appropriate and necessary component of a decision to impose discipline upon a career State employee for unacceptable personal conduct[,]" *Wetherington I*, 368 N.C. at 592, to "the extent there was any evidence to support them. [The disciplining agency] [can]not rely on one factor while ignoring the others." *Wetherington II*, 270 N.C. App. at 190. Where the agency ignores a required factor—or purports to consider it but actually applies a per se rule—we will not give the agency an additional "bite[] at the apple" to consider the factor, so long as the record permits our meaningful de novo review of the factor.[5] *Compare Wetherington II*, 270 N.C. App. at 191-201 (disallowing further discretionary factfinding despite the agency's failure to consider "severity of the violation," "resulting harm," and "discipline imposed in other cases involving similar violations" factors), *with Ayers II*, 279 N.C. App. at 523-27 (remanding based on our inability to meaningfully review the "resulting harm" factor).

In *Wetherington II*, we separately analyzed each of the five *Wetherington* factors. *Wetherington II*, 270 N.C. App. at 191-200. There, the petitioner,

> then a trooper with the North Carolina State Highway Patrol, misplaced his hat during a traffic stop; he then lied about how he lost his hat, which was later recovered, mostly intact. [The highway patrol] terminated [his] employment as a trooper based upon its "per se" rule that any untruthfulness by a state trooper is unacceptable personal conduct and just cause for dismissal.

---

[5] In contrast, where an incomplete investigation frustrates our meaningful de novo review of a required factor, we remand for further investigation, as we did in DSS's prior appeal. *Ayers II*, 279 N.C. App. at 523-27.

*Id.* at 162. On the trooper's initial appeal, our Supreme Court held the patrol's "use of a rule requiring dismissal for all violations of the [p]atrol's truthfulness policy was an error of law"[6] and remanded for the patrol to make a proper just cause analysis. *Wetherington I*, 368 N.C. at 593. On remand, the patrol affirmed its termination of the trooper. On appeal from that determination, we held the patrol's second consideration "was substantively no different" than its prior application of a per se rule and "conclude[d] as a matter of law, on *de novo* review, that [the trooper's] unacceptable personal conduct was not just cause for dismissal." *Wetherington II*, 270 N.C. App. at 163, 199.

Here, DSS likewise failed to undertake a proper just cause analysis initially. *Ayers II*, 279 N.C. App. at 523-25. On remand, DSS again considered the UNC School of Government twelve-factor test, *see id.* at 516-17, 524, but did so "along with the five *Wetherington* factors." Although *Wetherington I*'s recognition of the "flexible definition of just cause" and description of "factors *such as*" the five it explicitly addressed contemplates that additional factors may sometimes be relevant to just cause, *Wetherington I*, 368 N.C. at 591-92 (emphasis added) (marks omitted), DSS makes no argument that the twelve factors of the UNC School of Government were either appropriate or necessary to its analysis of just cause here. We believe the

---

[6] Thus, the law is no longer—as DSS seeks to rely—that "[o]ne act of UPC presents 'just cause' for any discipline, up to and including dismissal." *Hilliard v. N.C. Dep't of Corr.*, 173 N.C. App. 594, 597 (2005).

*Wetherington* factors are sufficient for us to analyze de novo whether Ayers's conduct constituted just cause for her termination, so we do not consider the twelve-factor test.

## D. Analyzing the Just Cause Factors

Having discussed the just cause framework, we turn to whether DSS had just cause to dismiss Ayers. Before analyzing the appropriate and necessary factors, however, we address generally DSS's challenges to findings of fact. DSS purports[7] to challenge 39 of 139 findings of fact and 28 of 52 conclusions of law—several of which, in actuality, are findings of fact, *see Watlington*, 261 N.C. App. at 768—as unsupported by substantial evidence. These challenges, as well as DSS's discussion of resulting harm, frequently highlight how Hurd's version of the facts in DSS's Final Agency Decision Addendum differ from the ALJ's findings. This approach is unpersuasive because the ALJ "was not obligated to find facts based on" a party's "*own* view of the record," *Brewington*, 254 N.C. App. at 23, and because "we defer to the ALJ's findings of fact, *even if evidence was presented to support contrary findings*." *Harris*, 252 N.C. App. at 108 (emphasis added).

We turn to our just cause analysis and consider each of the "appropriate and necessary" factors in turn. *Wetherington I*, 368 N.C. at 592. In doing so, we address

---

[7] DSS does not specifically argue nine of these findings. *See Brewington*, 254 N.C. App. at 17 ("[B]ecause finding of fact 11 is the only finding that [the petitioner] challenges with a specific argument, issues concerning the remaining challenged findings have been abandoned.").

specific challenged findings of fact as necessary.  *See Wetherington II*, 270 N.C. App.

at 178 n. 8.

## 1.  Severity of the Violation

We first address the severity of Ayers's UPC.  Since our Administrative Code

defines UPC flexibly such that "there is no bright line test to determine whether an

employee's conduct establishes [UPC,]" *Carroll*, 358 N.C. at 675; *see* 25 N.C.A.C.

1J.0614(8) (2023), we cannot pragmatically assess Ayers's UPC against some baseline

violation.  *See Watlington*, 261 N.C. App. at 770 (marks omitted) ("[C]omparing the

misconduct in this case to the misconduct in . . . cases in which our appellate courts

have held just cause for dismissal existed . . . is unpersuasive, as just cause . . . can

only be determined upon an examination of the facts and circumstances of each

individual case.").  Rather, for this factor, we examine the potential harmfulness and

frequency of Ayers's UPC.  *See id.* at 770-71 (considering potential harm and the

frequency of the petitioner's misconduct, albeit without explicitly discussing the

*Wetherington* factors); *accord Davis v. N.C. Dep't Health & Hum. Servs.*, 269 N.C.

App. 109 (2019) (unpublished) ("[T]he potential for harm does speak to the severity

of the violation.").

In *Wetherington II*, our severity analysis discussed the context and effects of

the trooper's UPC in a manner that, at first, appears duplicative of the "subject

matter involved" and "resulting harm" factors, but actually suggests a potential harm

inquiry.  We said that the trooper's "untruthful statement regarding losing his hat

was not a severe violation of the truthfulness policy" because "[i]t did not occur in court and it did not affect any investigation, prosecution, or the function of the Highway Patrol"; rather, it "was about a matter . . . all parties concede was not very important." *Wetherington II*, 270 N.C. App. at 191. Thus, our discussion connected the lie's out-of-court context to its lack of effects on patrol's investigatory and prosecutorial functions. In this light, any apparent redundancy between this factor and "resulting harm" merely reflected that the particular circumstances created minimal, if any, potential harm.

In *Wetherington II*'s severity analysis, we further considered the isolated nature of the trooper's UPC. Specifically, the trooper's conduct was not "an elaborate lie full of fabricated details" but rather contained only a singular fabricated detail: "the lie or 'untruth' lay only in the hat's location when [the trooper] misplaced it." *Wetherington II*, 270 N.C. App. at 191-92. Conversely, in *Watlington v. Department of Social Services of Rockingham County*, we considered that the frequency of the dismissed employee's UPC displayed a "repeated inclination" to engage in it. *Watlington*, 261 N.C. App. at 770-71 (considering the employee's five instances of exchanging gifts with social services clients).

Here, the ALJ concluded "[t]he preponderance of evidence proved there was only a minimal degree of potential risk that Petitioner's racial comment could or would have affected [] Respondent's integrity, employee morale, or provision of services." DSS points to several unavailing bases for potential harm. Primarily, it

argues it has shown "widespread potential harm" in that its continued employment of Ayers would reflect poorly on Hurd's "credibility and trust" in the eyes of the county board of social services. *See* N.C.G.S. §§ 108A-1 to -11 (2023). DSS grounds this argument in the Addendum, but the ALJ made no findings of fact that reflect how Ayers's UPC could have affected Hurd's individual reputation in the eyes of the board. *See Harris*, 252 N.C. App. at 100. Regardless—as consistent with the ALJ's final decision—we do not see how an adverse reflection on Hurd's individual reputation, if any, based solely on Hurd's own assertions, created any potential to undermine the mission of DSS or is otherwise relevant to whether DSS had just cause to dismiss Ayers.

DSS further posits that "Petitioner's UPC exposed DSS to vulnerability for negligent retention and supervision liability" and "violated DSS's compliance with the Civil Rights Act of 1964[,]" *see* 42 U.S.C. § 2000d, et seq., which "could jeopardize the receipt of federal funding." The ALJ found,

> 123. While [] Hurd and Respondent claim that Petitioner violated various policies that Respondent is required to follow, [] Hurd and Respondent failed to demonstrate how Petitioner violated any of these policies when she spontaneously uttered a racial slur in a vacant office to her supervisor. . . .

DSS argues this finding is contrary to several portions of the record: the policies themselves, Hurd's testimony, the Addendum, and Sutton's testimony. But none of this evidence demonstrates how DSS's usage of non-dismissal forms of discipline to

address Ayers's UPC would have subjected the agency to tort liability or violated federal law.

Despite this lack of identifiable liability, Ayers's conduct carried a risk of significant potential harm, albeit a relatively low risk of that harm coming to pass. Ayers's use of a racial slur in an office, with the door open, created the possibility that her subordinate employees or a client in the building might have overheard the language. And the impact of such a slur having been heard was potentially great; Sutton testified that merely learning of Ayers's "inappropriate, disrespectful, and belittling" words *after-the-fact* adversely affected her professional relationship with Ayers, undermined Ayers's supervisory authority, and was inconsistent with DSS's core values. This conduct, if exposed to a subordinate or client, "would have affected [] Respondent's integrity, employee morale, [and the] provision of services," not only by virtue of the morale impact on any listeners who have been personally affected by the slur, but also by severely undermining confidence that DSS's employees were discharging their duties in a manner that upheld the dignitary equality of all persons, regardless of race.

However, our "severity of the violation" inquiry does not end there. While gravity of the harm, had it come to pass, speaks to the severity of the conduct, "that Petitioner's conduct . . . was an aberrant and unintended event" mitigates this severity. The ALJ found,

139. The preponderance of the evidence established that Petitioner's conduct on [3 November 2017] was an aberrant and unintended event. There was no evidence that Petitioner acted maliciously, with any racially-motivated reason or with any racially motivated intent to offend, harass, or belittle any given ethnicity, race, or anyone with whom she worked. Instead, the evidence proved that Petitioner's statement was a careless mistake and a "momentary lapse in judgment" by a highly effective and professional employee.

This finding is best characterized as an ultimate fact, and it is reasoned from ample evidentiary facts; in particular, those reflecting that Ayers has not otherwise made inappropriate remarks and expressed immediate and consistent embarrassment, regret, and remorse:

35. Petitioner immediately regretted her statement, told [] Hurd that she could not believe she had said that, and apologized to [] Hurd.

. . . .

37. Shortly after Petitioner made the above-described statement, Petitioner and [] Hurd left the vacant office to locate the file for the "F" family. On the way, Petitioner apologized to [] Hurd again and said something like, Please don't tell anyone about what I said, especially the first part. It's Friday." Petitioner made this request because she was embarrassed and surprised by what she had said.

. . . .

45. [After the 6 November 2017 pre-disciplinary conference], Petitioner apologized and told [] Hurd:

It was [an] inappropriate comment . . . It was a guess. It was words [that] just came out of her mouth. I shocked myself. I apologize. I

don't use these words in my personal life, my work life. I don't allow this in staffing. We were solving a 'word problem.' I apologize for me and to you. These comments were not to the family - I think not it means 'non-reported.' It was in a vacant office. It is inappropriate.

. . . .

60. At the 2018 Hearing, Petitioner admitted she "absolutely said something that's improper." "I'm still embarrassed by that." "I apologize for making that comment. I know the comment was unacceptable. It would be unacceptable in any setting, personal or professional."

61. She "had never made an off-color remark like that before in her [[] Hurd's] presence or anyone else's presence, at work or even my personal life."

. . . .

114. . . . . The evidence at both the initial hearing and at the reconvened hearing showed without question that Petitioner was remorseful about making a racial comment during the [i]ncident, . . . . Respondent failed to present any credible evidence to rebut those facts.

. . . .

124. . . . A preponderance of the evidence showed that Petitioner demonstrated introspection regarding her conduct in the [i]ncident, both immediately following the [i]ncident, throughout the local administrative processes, during the 2018 Hearing, and during the 2022 Hearing.

. . . .

128. Despite the passage of over four and one-half years between the [i]ncident and the 2022 Hearing, Respondent presented no evidence of any form of unprofessional

conduct by Petitioner in any setting other than during the [3 November 2017] [i]ncident.

129. Petitioner consistently expressed regret and embarrassment about the incident in her conversations with and written submissions to [] Hurd following the [i]ncident.

130. While testifying before the Undersigned on two separate occasions, several years apart, Petitioner has consistently demonstrated that she regrets and is embarrassed by her conduct from the [i]ncident.

In other words, although the harm itself *may* have been great under different circumstances, we cannot ignore the ALJ's findings that the circumstances themselves, including the time of day and volume of potential listeners in the building, created a low risk of such a harm actually coming to pass and were uncharacteristic of Ayers's past and future behavior relative to the incident.

DSS seeks to resist finding of fact 139 by challenging each of the above findings save for number 35. Specifically, DSS argues that Ayers has not been consistently remorseful. It acknowledges that several "findings imply Petitioner has in all ways been remorseful and taken responsibility for her egregious utterance" but adds that, "[n]otwithstanding the ALJ's discretion to [determine] matters of credibility, the record does not bear this out." However, several of the findings quoted above directly quote the evidence that "bears out" Ayers's remorse and acceptance of responsibility.

DSS also argues we cannot "ignore . . . DSS's repeated findings and conclusions made throughout DSS's investigation that Ayers showed no remorse and did not take

responsibility." But it was the ALJ's prerogative to assess the credibility and weight of DSS's investigatory findings. *See Harris*, 252 N.C. App. at 100. Moreover, the ALJ found Ayers's statements during DSS's investigation were "reasonably attributable to Petitioner's concern that [] Hurd had already made her decision about the [i]ncident" and that, "if she provided any more testimony about the [i]ncident, [] Hurd would just 'pick it apart and . . . make a deal out of that too.'" We hold the ALJ's ultimate fact 139 is properly reasoned from evidentiary facts, which in turn are supported by substantial evidence in the record.

Accordingly, the ALJ's finding and conclusion that Ayers's UPC was "an aberrant and unintended event" rather than a pattern of misconduct mitigates the severity of Ayers's UPC. Nevertheless, we reiterate that Ayers's UPC carried a risk of significant potential harm.

**2. Subject Matter Involved**

Turning to the subject matter involved, DSS does not identify the subject matter, arguing only "[t]here is no dispute . . . that the subject matter is most serious." Ayers, meanwhile, identifies the subject matter as "improper language[.]" However, the subject matter is best identified as the meaning of "NR" in the race field on DSS's intake form.

In *Wetherington II*, we considered the subject matter to be, trivially, "the loss of the hat"; that is, the object of the trooper's lie and not dishonesty generally.

*Wetherington II*, 270 N.C. App. at 192. Likewise, here, we consider the object of Ayers's racial slur. The ALJ found this was the meaning of "NR":

> 115. . . . Petitioner was only answering Hurd's question regarding what did the letters "NR" mean. Given those facts, there was no proof that Petitioner was referring to the specific family listed on the form when she blurted out her racial comment.

Again, pointing to the Addendum, DSS contends that Ayers intended her slur to describe the family listed on the DSS form. However, the ALJ credited Ayers's contrary testimony that she was not referencing the family but "trying to decipher the race code." Undeterred by this evidence, DSS makes a conclusory argument that, "Ayers'[s] own testimony on these issues does not and cannot amount to 'substantial evidence.'" But it is well established that "the probative value of particular testimony [is] for the [ALJ] to determine, and [the ALJ] may accept [or reject] . . . the testimony of any witness." *Harris*, 252 N.C. App. at 100 (second and third alterations in original).

Accepting finding of fact 115, this subject matter is not any person or family, mitigating its seriousness. However, we are also cognizant that, in light of the form's coding being used as a racial demarcation, the subject matter and decision to use the epithet carries an irretractable gravity, even when not referring to a particular person or family. Thus, the mitigation on this factor is, ultimately, only partial.

**3. Resulting Harm**

We proceed to "resulting harm." In *Ayers II*, we considered the factor as "harm to DSS" and held DSS had only considered "the *potential* for harm to the reputation of, and workers at, DSS[.]" *Ayers II*, 279 N.C. App. at 525. Thus, we "remand[ed] to the ALJ with instructions to remand to DSS" to investigate resulting harm to DSS. *Id.* at 527. Unsurprisingly, on this appeal, the parties devote the bulk of their arguments to this factor and related factual issues.

DSS identifies several bases for resulting harm. Specifically, DSS points to the disruption caused by Ayers's mandated absence, legal fees incurred by DSS in defending Ayers's dismissal, harmful rumors of Ayers's UPC upon her absence, Ayers's frustration of policies, Hurd's diminished trust in Ayers, and Hurd's personal offense upon hearing Ayers's UPC. Although DSS contends that "[Hurd], within her discretion, determined that there was irreparable harm to DSS. . . . . [Her] determination that harm resulted was a sufficient exercise of that discretion[,]" an agency's discretion does not permit it to classify any and all harm as "resulting harm."[8] *See Wetherington II*, 270 N.C. App. at 194 (rejecting the highway patrol supervisor's discussion of potential harm as a basis for resulting harm). Thus, we do not defer to Hurd's determinations of harm but, rather, consider the ALJ's findings related to each of DSS's proposed bases of resulting harm.

---

[8] In *Ayers II*, we rejected DSS's similar argument that its discretion permitted it to ignore the "resulting harm" factor entirely. *Ayers II*, 279 N.C. App. at 524-25.

The ALJ ultimately found each basis for resulting harm either resulted from the discipline itself or was not factually supported:

> 113. In the Final Agency Decision Addendum, [] Hurd characterized several matters as actual harm purportedly resulting from the [i]ncident. However, these matters are all either descriptions of potential harm or resulted from [] Hurd's decision to dismiss Petitioner and were not caused by or the result of the [i]ncident itself.
>
> . . . .
>
> 133. After conducting an investigation specifically to determine whether the agency suffered any actual harm resulting from the [i]ncident, [] Hurd was unable to show that the agency suffered any actual harm. However, [] Hurd tried to portray the potential for harm as actual harm even though much of the potential harm was speculative, based only on her subjective belief, or is contrary to or otherwise refuted by the passage of nearly five (5) years since [] Hurd dismissed Petitioner.

We agree with the ALJ's legal conclusion that "potential harm [and matters] result[ing] from [] Hurd's decision to dismiss Petitioner" are not resulting harm. *See Wetherington I*, 368 N.C. at 592; *Wetherington II*, 270 N.C. App. at 194-95. Further, we consider the ALJ's findings and conclusions to the effect that DSS has not otherwise shown resulting harm are best classified as ultimate findings of fact. Thus, for each of DSS's bases, we inquire whether DSS may fairly characterize it as resulting harm; and, if so, we further consider whether the ALJ's ultimate finding that the basis lacks factual support was appropriately reasoned from evidentiary findings supported by substantial evidence.

**a. Ayers's Absence and DSS's Legal Expenses**

We have previously distinguished between resulting harm and mere potential harm. *E.g.*, *Wetherington II*, 270 N.C. App. at 194-95. This case requires us to further distinguish between the harm proximately resulting from the UPC and that resulting ipso facto from an agency's imposition of discipline. When an agency disciplines an employee for UPC, we inquire "whether *that misconduct* amounted to just cause for the disciplinary action taken." *Warren I*, 221 N.C. App. at 383 (emphasis added). Any harm resulting *from* the discipline had not yet resulted when the agency was required to determine whether just cause existed *for* the discipline.[9] *See Brown*, 269 N.C. App. at 128-32 (adopting the U.S. Supreme Court's reasoning that "after-acquired evidence . . . could not serve as a valid justification for upholding the employee's termination because the employer did not know [this evidence] until after she was discharged" and applying it to contested cases brought by career State employees).[10]

DSS's proposed bases for resulting harm illustrate this point. DSS argues Ayers's UPC "interrupted [Hurd's] normal duties and require[ed] others to pick up her workflow" and notes "[t]he [Final Agency Decision] Addendum also addressed the actual harm to DSS's budget[.]" However, it does not challenge that "any

---

[9] DSS argues that some harm—specifically employee resignations—might have resulted had it not terminated petitioner. We decline to speculate what harm would and would not have resulted had DSS opted for a non-dismissal form of discipline.

[10] *Brown* further held "this type of evidence could be used to limit the employee's relief[,]" at least where the evidence creates an independent and lawful basis for the termination. *Brown*, 269 N.C. App. at 128. DSS does not ask us to limit Ayers's relief should we conclude it lacked just cause.

interruption of [] Hurd's duties, other staff's duties, or workflow at DSS was not due to the [i]ncident itself . . . [but rather] resulted from [] Hurd's decision to place Petitioner on leave and Petitioner's resulting absence from the agency after [] Hurd dismissed Petitioner."

These bases seek to use of the fact of Ayers's dismissal to justify the dismissal, but "[f]airness and equity do not allow just cause for dismissal to be predicated upon" the dismissal itself. *Cf. Whitehurst*, 257 N.C. App. at 947 ("Fairness and equity do not allow just cause for dismissal to be predicated upon [the petitioner's] failure to respond appropriately to facts of which he had no knowledge."). Rather, this circularity "is functionally indistinguishable from [a rule of] 'per se' dismissal[.]" *Wetherington II*, 270 N.C. App. at 191. A contrary holding would place disciplined State employees in a Catch-22, as an exercise of their right to appeal, *see* N.C.G.S. §§ 126-34.01 to -.02 (2023), would subject the agency to legal expenses and potentially tip the scales in favor of just cause, even where none had existed prior.[11]

### b. Rumors of Ayers's UPC

DSS also points to harm to Sutton upon learning of rumors of Ayers's UPC as a basis for resulting harm. Learning of Ayers's words "disappointed and shocked"

---

[11] Such a result could raise due process implications as well. *Brewington*, 254 N.C. App. at 27-28 ("It is well established that career State employees enjoy a property interest in continued employment. This property interest is created by state law, N.C.[G.S.] § 126-35(a), and is guaranteed by the Due Process Clauses of the Fifth and the Fourteenth Amendments to the United States Constitution.").

Sutton, and she understandably considered them "inappropriate, disrespectful, and belittling." However, Sutton did not witness Ayers's UPC and only learned of it because of Ayers's absence from work after her dismissal. The dismissal itself required DSS have just cause. N.C.G.S. § 126-35 (2023). DSS could not have relied upon after-the-fact office gossip as potential harm—realized only *after* the dismissal—as "resulting harm" to show just cause *for* the dismissal. *Brown*, 269 N.C. App. at 128-32.[12]

### c. Frustration of Policies

---

[12] DSS fairly notes, "[r]egardless of when or how she learned of the conduct, Sutton was harmed." Consistent with the "flexible concept" of just cause, *Carroll*, 358 N.C. at 669, we do not ignore this but have more appropriately considered it as potential harm—not-yet realized when DSS imposed discipline.

DSS also notes, "[i]t is likely that in many situations, properly investigating the use of racial slurs to a supervisor, will necessarily result in harm to colleagues who learn of the slurs. As such, Ayers'[s] use of the slurs, even though it was a single incident and even though she had little prior discipline, [or, more accurately, no prior discipline,] constitutes good cause for dismissal." DSS, elsewhere, argues, "[it] cannot possibly be the law of North Carolina" that "[Hurd] was required to ask other social workers whether they also heard the racial slurs" because such an investigation "would necessarily be causing additional harm to the agency by spreading the vile racist slurs throughout the agency[.]"

Whether DSS considers such a holding possible or not, we held DSS was required to conduct a complete investigation, sufficient for the ALJ to make findings of fact regarding resulting harm, including discerning "whether anyone else heard such statement[.]" *Ayers II*, 279 N.C. App. at 526 (emphasis omitted). To consider harm caused by or "spread" by an investigation as "resulting harm" would tie the level of resulting harm to the thoroughness of an agency's investigation therein. This would create tension between just cause's "notions of equity and fairness" and an agency's discretion over how to conduct its investigation. *See Brewington*, 254 N.C. App. at 14, 25.

We are mindful that, if mere knowledge of an employee's UPC would create harm, and if the very act of investigating UPC spreads knowledge of the UPC, it could be unavoidable for an agency to investigate just cause without spreading harm. If and when such cases arise, we trust agencies will exercise their discretion over their investigations in a manner to minimize that harm. We note, for example, that Hurd's transcribed interview of Sutton in this case utilized open-ended questioning that did not require Hurd to repeat Ayers's words, not even in redacted fashion.

Another of DSS's bases for resulting harm is an even more naked application of a *per se* rule. DSS argues "[t]he Addendum addressed harm to the DSS's mission and work by frustrating the purpose of numerous policies[.]" Although Ayers's policy violation was certainly relevant to whether Ayers's conduct constituted UPC, Ayers does not contest that prong of *Warren*. Rather, at this prong, we consider whether *this particular* "frustrati[on] of the purpose" of a policy "amounted to just cause for the disciplinary action taken." *Warren I*, 221 N.C. App. at 383. Restating the fact of the UPC does not advance this inquiry. Further, although Hurd testified that "a supervisor who disregards policy is harmful because supervisors are intended to be leaders" at DSS and it is "important that they demonstrate compliance with those policies personally[,]" Ayers's position as supervisor or leader "does not lower the standard that must be met in order to justify [her] dismissal." *See Whitehurst*, 257 N.C. App. at 948.

**d. Hurd's Diminished Trust in Ayers**

DSS's remaining bases for resulting harm lack factual support. DSS argues it showed harm to Hurd in that "Petitioner's UPC justifiably obliterated [Hurd's] trust in Petitioner's judgment, . . . [and] there was simply no way Petitioner could function autonomously without total supervision or eliminate the risk of another abhorrent racial outburst." Although this reads more like potential harm, it is relevant to just cause regardless (to the extent it is supported in fact) and we address it here.

In *Wetherington II*, we held a supervisor's unreasonable belief that an employee would repeat his UPC if permitted to remain in his position is not a proper basis for resulting harm. There, the trooper's supervisor claimed in his dismissal letter to the trooper that

> I have no confidence that you can be trusted to be truthful to your supervisors or even to testify truthfully in court or at administrative hearings. . . . [Y]our ability to perform the essential job functions of a Trooper is reparably limited due to the Highway Patrol's duty to disclose details of the internal investigation to prosecutors[.] . . . If you were to return to duty with the Highway Patrol I could not, in good conscience, assign you to any position . . . within the Highway Patrol . . ., any assignment would compromise the integrity of the Highway Patrol and the ability of the State to put on credible evidence to prosecute its cases.

*Wetherington II*, 270 N.C. App. at 165. But while "[i]t [was] easy to understand the resulting harm to the agency from a trooper's intentional lie about substantive facts in sworn testimony or in the course of his official duties[,]" the trooper had made no lie of that sort, and the highway patrol "ha[d] never been able to articulate how *this particular lie* was so harmful." *Id.* at 195 (emphasis added). Rather, the highway patrol's analysis was "substantively no different" than a per se rule because any "sort of untruthfulness, in any context" would have permitted dismissal under the highway patrol's reasoning. *Id.* at 195, 199.

Under *Wetherington II*, Hurd and DSS could not reasonably presume Ayers's one instance of UPC meant she would have a future "racial outburst" in the manner that the highway patrol assumed the trooper's single lie meant he would have

perjured himself given the opportunity; they needed some reasonable ground for the belief. As DSS notes, Hurd was simultaneously the sole witness, "principal investigator," and administer of discipline, making this basis for harm wholly dependent on the reasonableness of her individual belief. However, the ALJ found this belief to be unreasonable:

> 114. [] Hurd subjectively believed that Petitioner was not fit to be entrusted with her supervisory or other duties for Currituck DSS and claimed this belief constituted "harm" resulting from the [i]ncident. However, Hurd's subjective belief was unsubstantiated, speculative, and unreasonable. [] Hurd's subjective opinion on these matters was not supported by a preponderance of the evidence and was contrary to other evidence in the record. The evidence at both the initial hearing and at the reconvened hearing showed without question that Petitioner was remorseful about making a racial comment during the [i]ncident, that Petitioner's comment was uncharacteristic of her, and that there was no reasonable expectation or likelihood that Petitioner would repeat such comment. Respondent failed to present any credible evidence to rebut those facts.

On the other hand, the ALJ expressly found, based on supporting evidence on the record, "Hurd's decision to dismiss Petitioner from employment was influenced by [] Hurd's past philosophical differences with Petitioner and their past history."

These findings were amply reasoned from unchallenged findings of fact that reflect the "friction[,]" and "difficult but professional relationship[,]" and "significant philosophical differences" between Hurd and Ayers. Indeed, DSS admits that Hurd relied, in part, on these "prior difficulties" to determine "there was irreparable harm to DSS[.]" Further, Romm—the former DSS director over both employees—"did not

think [Ayers's] conduct on [3 November 2017] was typical or characteristic of [her] behavior" and had no "doubts or concerns about [her] fitness to be a supervisor at [] DSS[,]" despite her UPC.

DSS further challenges finding of fact 114 based on its opinions that Ayers was not remorseful and had a "racist upbringing[.]" But the ALJ's findings reflect neither of these, and any evidence in support of its opinions does not preclude the ALJ's findings to the contrary. *See Harris*, 252 N.C. App. at 108.

### e. Hurd's Personal Offense

DSS's last basis of resulting harm is that "[h]earing the statement harmed [Hurd's] morale, who considered it highly offensive, vulgar, crude, and discriminatory." The ALJ found "Respondent presented no evidence . . . that Petitioner's comment during the [3 November 2017] [i]ncident affected . . . the morale of any DSS employees . . . . [T]he [i]ncident did not affect . . . the morale of any employee[.]" Citing a portion of Hurd's 2018 testimony, DSS argues "[i]t is not true there was no evidence of it negatively impacting the morale of any DSS employee . . . Hurd is an employee[] . . . [and] testified to the unsettling effect this had on her." However, "the probative value of particular testimony [is] for the [ALJ] to determine*,"* *id*. at 100 (second alteration in original), and we have, in *Ayers II*, already considered the effect of this testimony and held Hurd's consideration that she "thought [Ayers's] UPC] was extremely offensive and inflammatory" was not consideration of resulting harm. *Ayers II*, 279 N.C. App. at 525. We may not revisit our conclusion that Hurd's

personal offense was not resulting harm to DSS. *Wetherington II*, 270 N.C. App. at 172-73 ("According to the doctrine of the law of the case, once an appellate court has ruled on a question, that decision becomes the law of the case and governs the question both in subsequent proceedings in a trial court and on subsequent appeal.").

Having considered each of DSS's proposed basis for resulting harm, we hold the ALJ's ultimate findings that DSS has not shown resulting harm are properly reasoned from evidentiary facts supported by substantial evidence in the record. The facts, as the ALJ found based on substantial evidence, do not show that Ayers's UPC had caused any resulting harm to DSS, its reputation, its employees, or its ability to provide services to the public at the time DSS dismissed Ayers. This factor weighs against the existence of just cause to dismiss Ayers.

## 4. Ayers's Work History

Having discussed at length the "resulting harm" factor, we turn to Ayers's work history. Analyzing this factor in *Whitehurst v. East Carolina University*, we considered both the dismissed employee's performance reviews and her disciplinary history. *Whitehurst*, 257 N.C. App. at 938.

DSS does not challenge the ALJ's findings related to Ayers's work history:

> 10. From 2011 through 2017, [] Romm conducted the annual evaluations of Petitioner.[] Romm consistently rated Petitioner as "substantially exceeded" expectations in all areas and rated Petitioner's performance as "Excellent" in all areas. An "Excellent" rating was the highest possible evaluation rating an employee can receive in a performance evaluation.

11. [] Romm never had any concerns about Petitioner's professionalism, adherence to policy, attitude, or her work performance.

12. Until her dismissal, Petitioner had not received any prior disciplinary action during her employment with Respondent.

. . . .

132. In the [8 November 2017] termination letter and the [21 November 2017] Final Agency Decision, [] Hurd referenced a [21 July 2017] conversation with Petitioner to show she had placed Petitioner on prior notice that Petitioner's conduct towards [] Hurd was inappropriate and unprofessional. However, the preponderance of the evidence showed that [] Hurd actually relied upon the [21 July 2017] conversation to show support for, and further justify, her decision to dismiss Petitioner even though she never documented her [21 July 2017] conversation with Petitioner as a disciplinary action. . . . Hurd never issued any disciplinary action to Petitioner for prior job performance or conduct deficiencies. [] Hurd never documented the [21 July 2017] matter in writing or as a disciplinary action. There was no evidence [] Hurd documented "many discussions" with Petitioner about any prior unacceptable conduct.

DSS does not argue we should consider the 21 July 2017 conversation and concedes Ayers's work history is "mitigation[.]" As Ayers received consistently excellent performance reviews and had no prior disciplinary actions, "[t]his factor could only favor some disciplinary action short of termination." *Wetherington II*, 270 N.C. App. at 196.

**5. Discipline Imposed in Other Cases Involving Similar Violations**

We now turn to the final *Wetherington* factor. DSS argues "[t]he ALJ's reliance on the lack of prior DSS discipline for similar conduct is misleading as no employee had ever used a racial epithet at work before." To the extent the ALJ considered that DSS permitted employees to use non-racial profanity in the workplace, we agree with DSS that this was error. However, this does not end our inquiry into this factor.

Consistent with just cause's "notions of equity and fairness[,]" *Carroll*, 358 N.C. at 669, we have characterized this factor as whether "this dismissal was based upon disparate treatment[.]" *Wetherington II*, 270 N.C. App. at 198-99. "Similar violations" are not limited to factually similar UPC; rather, the similar violations only need "some relevant denominator . . . for comparison." *Id.* at 199. "Although there is no particular time period set for this factor, [there is] no legal basis for relying only upon disciplinary actions during a particular [director's] tenure." *Id.*

In *Warren*'s second trip to this Court, we considered a State employee's dismissal for a violation of his agency-employer's policy against unbecoming personal conduct by driving his patrol vehicle while off duty and with an open bottle of liquor in the trunk. *Warren v. N.C. Dep't of Crime Control & Pub. Safety* ("*Warren II*"), 267 N.C. App. 503, 506-10 (2019). Under the first two prongs, we held the employee violated the policy and that the violation was UPC. *Id.* at 506-08. But, at the third prong, we held there was no just cause for the employee's termination, in part because

> the disciplinary actions [the] respondent has taken for unbecoming conduct typically resulted in either: a temporary suspension without pay, a reduction in pay, or a

demotion of title.  In fact, where the conduct was equally or more egregious than that of petitioner (i.e., threats to kill another person, sexual harassment, assault), the employee was generally subjected to disciplinary measures other than termination.

*Id.* at 509.

Here, DSS does not challenge the ALJ's findings that

21. During Romm's nineteen years as Director of Currituck DSS, Romm dismissed three individuals for engaging in unacceptable personal conduct.  Each of these employees had engaged in either a pattern or a series of unacceptable personal conduct repeatedly over a period of time.  One employee lied to Romm for months regarding an unauthorized destruction of case records.  A second employee refused to perform a core duty of her position.  [] Romm fired that employee when the employee failed to perform a second core duty involving the safety of children and after the supervisor advised the employee of the serious consequences that could result from her continued refusal to perform her duties.  A third employee falsely reported, written and verbally, the status of cases over several months.

22. [] Ro[m]m never terminated anyone for unacceptable personal conduct based solely on a one-time incident.  She never terminated anyone for unacceptable personal conduct based on something the employee said in a private conversation.

. . . .

[Conclusion of law] 46. In this case, it was undisputed that neither [] Hurd nor [] Romm had encountered a similar conduct violation at Currituck DSS in the past.  Neither [] Hurd nor [] Romm had dismissed any employee based on a single incident of misconduct in the past.  In fact, prior disciplinary practices at Respondent demonstrated that dismissal was not ordinarily imposed for a single act of

misconduct, and generally an employee would only be dismissed following a warning and repetition of some act of misconduct.

While we do not compare for all purposes the relative egregiousness of Ayers's use of a racial slur to previously dismissed DSS employees' dishonesty and dereliction of job duties, we conclude these prior instances of UPC establish the "relevant denominator[.]" *Wetherington II*, 270 N.C. App. at 199. DSS has not historically imposed dismissal as the discipline for an employee's first instance of UPC. Since Ayers's dismissal for a single instance of UPC is contrary to DSS historical practice, this factor weighs against the existence of just cause to dismiss Ayers.

## E. Balancing the Equities

Having analyzed each of the *Wetherington* factors, we reach the "irreducible act of judgment[,]" *Carroll*, 358 N.C. at 669, of whether DSS had just cause to dismiss Ayers.

DSS implores us to accord deference to its determination of just cause. Specifically, it argues Hurd "was best positioned to determine the impact of Petitioner's misconduct" based on her education and training, as well as in that "[s]he is of long tenure in that DSS and was selected by her predecessor for her integrity and judgment[.]" It further argues, "[a]s the supervisor, witness to the slurs, and principal investigator, [Hurd] had to rely on her judgement [sic] and discretion in determining whether harm was caused. The ALJ failed to give her sufficient deference in the challenged Conclusions of Law." However, "[the ALJ] . . . owe[d] no

deference to [Hurd's] conclusion of law that [] just cause existed" and was "free to substitute [her] judgment for that of [Hurd] regarding the legal conclusion of whether just cause existed for [DSS's] action." *Harris*, 252 N.C. App. at 102.

We likewise review the ALJ's legal conclusion de novo. *See, e.g.*, *Wetherington II*, 270 N.C. App. at 190. There is no "formulaic approach" for this determination. *See Watlington*, 261 N.C. at 770. Although not every *Wetherington* factor must favor the existence of just cause for it to exist,[13] *e.g.*, *id.* at 770-72 (determining just cause existed despite a lack of resulting harm), we may not ignore the absence of factors. *See Wetherington II*, 270 N.C. App. at 190 ("[The disciplining agency] could not rely on one factor while ignoring the others.")

We hold DSS failed to meet and carry its burden of proving it had just cause to dismiss Ayers for her UPC. In doing so, we do not "compar[e] the misconduct in this case to the misconduct in . . . cases in which our appellate courts have held just cause for dismissal existed" or did not exist, *Watlington*, 261 N.C. at 770, but hold only "upon an examination of the facts and circumstances of [this] individual case[,]" as found by the ALJ and supported by substantial evidence. *Carroll*, 358 N.C. at 669. Ayers's use of a racial slur in the workplace, even when not directed at a particular person and seemingly without the intent to convey racial animosity, was a severely unprofessional and insensitive choice. But the ALJ did not, and we cannot, ignore

---

[13] Thus, DSS is correct when it argues "actual harm is not necessary to support a decision to terminate under the law."

the considerable circumstances in mitigation: Ayers immediately and consistently recognized and regretted the wrongfulness of her conduct, DSS has not shown any harm had resulted by the time it terminated Ayers, Ayers had an otherwise unblemished employment history, and DSS has not historically dismissed employes for a single instance of UPC. In other words, despite the severity and seriousness, DSS has not established why appropriately addressing Ayers's UPC required it to deviate from its historical disciplinary practices where Ayers's UPC was an aberrant incident for which she readily accepted responsibility and felt remorse, especially where no actual harm resulted.

To conclude our just cause analysis, we address one more argument from DSS. It argues that

> to suggest that an agency tasked with protecting minority children is not harmed when a State employee says the N-word to her supervisor when trying to determine the race [of] a family receiving critical services[] is disinguous to the equal rights movement and jurisprudence. Discipline amounting to nothing more than a slap on the wrist is a slap in the face to that policy and to all people receiving services therefrom. This [C]ourt should not cosign such inexplicable leniency and should instead draw a judicial line in the sand about what is and what is not appropriate within our governmental agencies.

Reasonable people can disagree about whether "the equal rights movement and jurisprudence" is best served by DSS's desired zero-tolerance policy[14] or one that

---

[14] DSS acknowledges that "Hurd, by her actions, was setting 'a very strong zero tolerance standard[.]'"

offers those who engage in UPC an opportunity to learn from their mistakes and earn a second chance. But any "judicial line in the sand" has already been drawn on the far side of DSS's preferred option: "the better practice, in keeping with the mandates of both Chapter 126 and our precedents, [is] to allow for *a range of disciplinary actions* in response to an individual act of [UPC], rather than the categorical approach" that DSS sought to employ. *Wetherington I*, 368 N.C. at 593 (emphasis added). Since DSS has not shown just cause to dismiss Ayers for this individual act of UPC, its disciplinary action must fall elsewhere on this range.

### F. ALJ's Alternative Discipline

We briefly mention the ALJ's alternative discipline.

> Under [N.C.G.S. § 126-34.02(a)(3)], the ALJ has express statutory authority to "[d]irect other suitable action" upon a finding that just cause does not exist for the particular action taken by the agency. Under the ALJ's *de novo* review, the authority to "[d]irect other suitable action" includes the authority to impose a less severe sanction as "relief."

> Because the ALJ hears the evidence, determines the weight and credibility of the evidence, makes findings of fact, and "balanc[es] the equities," the ALJ has the authority under *de novo* review to impose an alternative discipline. Upon the ALJ's determination that the agency met the first two prongs of the *Warren* standard, but just cause does not exist for the particular disciplinary alternative imposed by the agency, the ALJ may impose an alternative sanction within the range of allowed dispositions.

*Harris*, 252 N.C. App. at 109 (second, third, and fourth alterations in original); *see* N.C.G.S. § 126-34.02(a)(3) (2023).

Here, the ALJ ordered DSS to "retroactively reinstate Petitioner to the same or similar position she held prior to her dismissal with full back pay, suspend Petitioner for two weeks without pay, and order Petitioner to attend additional cultural diversity and racial sensitivity . . . training." Ayers does not contest that DSS had just cause to impose this form of discipline, and DSS does not argue it had just cause for discipline less than dismissal but greater than this alternative. Thus, the adequacy of this discipline is not before us, and we express no opinion on it.

## G. Attorney Fees

We do not reach DSS's attorney fees argument. Pursuant to its authority, the ALJ ordered DSS to reimburse Ayers the cost of reasonable attorney fees. *See* N.C.G.S. § 126-34.02(e) (2023) ("The Office of Administrative Hearings may award attorneys' fees to an employee where reinstatement or back pay is ordered[.]"); *see generally Rouse v. Forsyth Cnty. Dep't of Soc. Servs.*, 373 N.C. 400 (2020); *see also Hunt v. N.C. Dep't of Pub. Safety*, 266 N.C. App. 24, 32, *disc. rev. denied*, 373 N.C. 60 (2019) ("A[n] [ALJ's] decision to grant attorneys' fees is discretionary."). DSS argues only that we should reverse the ALJ's award of attorney fees based on the merits. Since we uphold the ALJ's decision that Ayers prevails on the merits, we do not reach this argument. *Id.*

## <u>CONCLUSION</u>

Reviewing de novo, based on the individual facts and circumstances of this case as reflected in the ALJ's findings of fact supported by substantial evidence, we conclude DSS failed to meet and carry its burden of proving it acted with just cause to dismiss Ayers. We affirm the ALJ's final decision.

AFFIRMED.

Judge TYSON concurs in result only.

Judge COLLINS dissents by separate opinion.

No. COA23-420 – *Ayers v. Currituck Cnty. Dep't of Soc. Servs.*

COLLINS, Judge, dissenting.

Petitioner was the supervisor for the Child Protective Services Unit at the Currituck County Department of Social Services ("DSS"). When responding to an inquiry from her supervisor, the DSS Director, as to what the racial demarcation "NR" meant on an intake form that had been completed by a social worker, Petitioner responded either "nigra rican" or "nigger rican." Petitioner initially laughed about the comment but became apologetic and embarrassed soon afterward. The sole issue before this Court is whether Petitioner's unacceptable personal conduct amounted to just cause for her dismissal. Because I believe Petitioner's unacceptable personal conduct was just cause for dismissal, I dissent from the majority opinion.

This Court has articulated a three-part analytical approach to determine whether just cause exists to support a disciplinary action against a career State employee for alleged unacceptable personal conduct:

> The proper analytical approach is to first determine whether the employee engaged in the conduct the employer alleges. The second inquiry is whether the employee's conduct falls within one of the categories of unacceptable personal conduct provided by the Administrative Code. Unacceptable personal conduct does not necessarily establish just cause for all types of discipline. If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the third inquiry: whether that misconduct amounted to just cause for the disciplinary action taken.

*Warren v. N.C. Dep't of Crime Control & Pub. Safety*, 221 N.C. App. 376, 383, 726 S.E.2d 920, 925 (2012).

Here, there is no question that Petitioner engaged in the misconduct DSS alleged and that Petitioner's misconduct falls within one of the categories of unacceptable personal conduct. The only issue is whether that unacceptable personal conduct amounted to just cause for her dismissal.

"Just cause must be determined based upon an examination of the facts and circumstances of each individual case." *Wetherington v. N.C. Dep't of Pub. Safety*, 270 N.C. App. 161, 193, 840 S.E.2d 812, 834 (2020) (quoting *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 669, 599 S.E.2d 888, 900 (2004)). In examining the facts and circumstances of each individual case, an "appropriate and necessary component" of a decision to impose discipline on a career State employee is the consideration of certain factors, including: "the severity of the violation, the subject matter involved, the resulting harm, the [career State employee's] work history, or discipline imposed in other cases involving similar violations." *Wetherington v. N.C. Dep't of Pub. Safety*, 368 N.C. 583, 592, 780 S.E.2d 543, 548 (2015).

Taking the first two factors together, the violation is severe precisely because of the subject matter involved. "Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' . . . .'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)); *see Granger v.*

2

*Univ. of N.C. at Chapel Hill*, 197 N.C. App. 699, 706, 678 S.E.2d 715, 719 (2009) (quoting *Spriggs*).

Furthermore, the harm, both resulting[15] and potential, was significant. Petitioner's conduct eroded the Director's trust in Petitioner's motives and judgment. Petitioner's conduct also negatively affected her African-American co-worker's ability to trust Petitioner's judgment and accept guidance from Petitioner. Moreover, DSS has policies prohibiting individuals from using demeaning or inappropriate terms or epithets and telling off-color jokes concerning race. DSS has a duty to enforce these policies, and to further its stated goal of supporting parents by respecting each family's cultural, racial, ethnic, and religious heritage in their interactions with the family and the mutual establishment of goals. Finally, Petitioner's unacceptable personal conduct exposed DSS to vulnerability for negligent retention and supervision liability and violated DSS's compliance with the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000d, *et seq.*, which could jeopardize its receipt of federal funding.

There was no evidence in this case of discipline imposed in other cases involving similar violations in this or similar DSS offices. Thus, the fourth factor

---

[15] "No showing of actual harm is required to satisfy definition (5) of [unacceptable personal conduct], only a potential detrimental impact (whether conduct like the employee's could potentially adversely affect the mission or legitimate interests of the State employer)." *Hilliard v. N.C. Dep't of Corr.*, 173 N.C. App. 594, 597, 620 S.E.2d 14, 17 (2005) (citing *Eury v. Emp't Sec. Comm'n*, 115 N.C. App. 590, 610-11, 446 S.E.2d 383, 395-96, *disc. review denied*, 338 N.C. 309, 451 S.E.2d 635 (1994). The ALJ's conclusion in this case that Petitioner's unacceptable personal misconduct did not cause Respondent actual harm as a basis for concluding there was no just cause to dismiss Petitioner is thus erroneous.

need not be considered. *See Wetherington*, 270 N.C. App. at 189-90, 840 S.E.2d at 831 (courts must consider "any factors for which evidence is presented"). Nonetheless, this case is similar to *Granger*, wherein an employee was dismissed for uttering a racial slur to a subordinate. 197 N.C. App. at 706-07, 678 S.E.2d at 719-20 ("By uttering this epithet in the workplace, where Petitioner was overheard by one of her subordinates, Petitioner undermined her authority and exposed Respondent to embarrassment and potential legal liability.")

Although this appears to have been an isolated incident by Petitioner, a single act of unacceptable personal conduct can present just cause for any discipline, up to and including dismissal. *See Hilliard*, 173 N.C. App. at 597, 620 S.E.2d at 17 ("One act of [unacceptable personal conduct] presents 'just cause' for any discipline, up to and including dismissal." (citations omitted)). When the facts and circumstances are considered together, I believe Petitioner's unacceptable personal conduct was just cause for Petitioner's dismissal. I would thus reverse the ALJ's decision to award reinstatement and attorney's fees and affirm DSS's decision to terminate Petitioner.